# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09 B 38337 |
| EDWARD T. COHN, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| ———————————————— | ) | |
| | ) | |
| ALIZA KORRUB, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 10 A 1735 |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| EDWARD T. COHN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint brought by Plaintiff Aliza Korrub against Defendant Edward T. Cohn, seeking a finding that the debt Cohn owes to Korrub is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), and that Cohn's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3), (a)(4)(A) and (a)(6)(A). Korrub also requested an award of attorney's fees and costs. Having heard the testimony of Korrub and Cohn, reviewed the admitted exhibits, and read the post-trial memoranda of law, the court will enter judgment for Cohn on all counts except Count V. Judgment will be entered for Korrub on Count V and Cohn's discharge will be denied.

## JURISDICTION

Under 28 U.S.C. § 1334, district courts have original and exclusive jurisdiction of all cases under Title 11. The underlying bankruptcy case was automatically referred to this court

pursuant to Internal Operating Procedure 15(a) of the United States District Court for the

Northern District of Illinois, as authorized by 28 U.S.C. § 157(a).

This adversary proceeding, filed within the bankruptcy case, seeks a finding that Cohn's

debt to Korrub is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).  The

complaint also seeks a finding that Cohn's discharge should be denied pursuant to 11 U.S.C. §

727(a)(3), (a)(4)(A) and (a)(6)(A).

This adversary is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).  Since a

proceeding to determine dischargeability and to deny discharge "stems from the bankruptcy

itself," Stern v. Marshall, 564 U.S. 462, 499 (2011), this court has both the statutory and the

constitutional authority to enter final judgment on the complaint.

## FINDINGS OF FACT

### Cohn and Korrub Meet and Decide to Build a Spec House Together

Sometime in late 2003, Edward Cohn walked into the Koenig & Strey real estate

brokerage in Wilmette.  Tr. at 36; 148.  He was looking to see if there was any land available for

building a single family home.  Tr. at 36-37; 148.  Aliza Korrub, who worked in the office as a

licensed agent, approached Cohn to see if she could help.  Tr. at 40.

Korrub and Cohn eventually agreed to build a "spec" home together at 21 Brookhill

Drive in Northfield (the "Brookhill Property").  Tr. at 40-41.  They formed a limited liability

company named 21 Brookhill Drive, LLC.  Tr. at 41; **Pl. Ex. 8**.  Korrub and Cohn (as president

of Concept Design Construction, Inc.) were both members and managers of 21 Brookhill Drive,

LLC.  Tr. at 42; **Pl. Ex. 8**.

Cohn had formed Concept Design in 1997, the year he started working as a contractor.

Tr. at 37, 107.  Through Concept Design he did remodeling, renovations, additions, and new

home construction. Tr. at 37-38. Cohn, the sole employee and shareholder, operated Concept Design as a general contractor, and hired subcontractors to do the physical labor on his construction projects. Tr. at 38. Over the years he built about a dozen houses as a general contractor. Tr. at 107.

The agreement between Korrub and Cohn basically provided that she would purchase the raw land, and Concept Design would secure construction financing as well as serve as the general contractor in connection with construction of the house. Tr. at 42-43, 108; **Pl. Ex. 8**. Cohn originally had another investor lined up to purchase the land, but when that funding fell through, Korrub said "well, I'd buy the land, and we'll work together on the project. And that's how that happened." Tr. at 149, lines 16-17.

Korrub purchased the real property for $285,000, which she financed through a home equity loan on her residence. Tr. at 149-50. When it came time to sell the Brookhill Property, Korrub would be reimbursed for her $285,000 outlay, and the profits would be split 60% to Concept Design and 40% to Korrub. Tr. at 43-44, 150; **Pl. Ex. 8**.

A portion of Concept Design's share of the profits would be distributed to Cohn's investors, who had not given Cohn any funds but had arranged for and guaranteed the construction loan from American Chartered Bank. Tr. at 44-45, 47; **Pl. Ex. 9**. Cohn admitted that "I had – I didn't have very good credit. There was no way I was getting – I was able to get a loan." Tr. at 124, lines 10-12. Korrub knew that Cohn had investors on board. Tr. at 124. She did not know much more than that. "[T]hat was not my job. I did the land, and he prepared the investors in the construction loan." Tr. at 163, lines 22-24.

Cohn and Korrub, as managers of 21 Brookhill Drive, LLC, signed a promissory note evidencing the $631,000 construction loan on May 20, 2004. Tr. at 45-46; **Pl. Ex. 9**.

3

They also signed a construction loan agreement on the same day.  A budget is attached as Exhibit A to the construction loan agreement.  **Pl. Ex. 9**.  Cohn prepared the budget, which estimated the total cost of construction at $945,200, including $285,000 for the land purchase.  Tr. at 47-49; **Pl. Ex. 9**.

Korrub never reviewed the construction budget, although she initialed it.  Tr. at 161.  "I didn't know where money was going for or anything.  There was a construction loan, which was going to be used to build a house.  What was going for what, I never knew."  Tr. at 150, line 23 – p. 151, line 2.  At the time they started the project, Cohn and Korrub estimated their profit on the project would be between $300,000 and $400,000.  Tr. at 151.

### The Spec House is Built at a Cost Nearly 50% Higher Than Originally Budgeted

The amount of the construction loan was increased several times, eventually ending with a principal amount of $977,000.  **Pl. Ex. 9**.  According to Cohn, each of the increases were due to upgrades in the construction of the home.  Tr. at 58-59.  "[A]nd on every upgrade, as you can see, it was discussed with Aliza, because every upgrade has her sig – every time we increased it, it has to have her signature on there. . .".  Tr. at 56, lines 5-9; Tr. at 125.  Korrub denied agreeing to the upgrades: "Any upgrade he did on his own.  He never consulted me."  Tr. at 154, lines 11-12.

According to Korrub, she did not sign the loan increases "willingly."

They were brought to my office, usually with no notice, with very little notice, usually by someone who worked for him by the name of Matt.  And I was told I had to sign them while he waited for them mostly.

Tr. at 152, lines 14-18.  At one point a loan guarantor told Korrub that if she didn't "sign by the end of the day, he'll foreclose on the house, and then he'll go and he'll put the whole thing in his wife's name.  Those are the kind of phone calls I had with these people, okay?"  Tr. at 166, lines 4-8.

"[E]very time I asked for an accounting for the extra money and why he needed an increase in the construction loan," Korrub testified, "I never got anything." Tr. at 155, lines 9-12. Korrub's lawyer told her that "we'll have to deal with all this after closing." Tr. at 152, line 20.

Since she was the land owner, Korrub paid the utility bills associated with the project. "Even after closing, I was being chased for the water bills." Tr. at 153, lines 5-6. She also paid the real estate taxes that accrued during the building process. Tr. at 153.

Korrub occasionally visited the building site as the house was being constructed. Tr. at 157. She "would park in the commercial parking lot next door and walk the property once in awhile." Tr. at 157, lines 16-17.

The construction loan agreement required submission of lien waivers from all subcontractors to be attached to each request for disbursement of funds, and numerous waivers were submitted throughout the construction process. **Pl. Ex. 9; Pl. Ex. 10**. While some of the lien waivers were submitted directly from Cohn's subcontractors, he prepared and signed others himself. Cohn testified that he paid the subcontractors directly when he submitted these lien waivers. Tr. at 116.

When asked why he paid the subcontractors and then submitted the lien waivers himself, Cohn testified that "[a] lot of times in the beginning of doing this for a saving [sic], you're not – you don't – you're not 100 percent sure who you're going to use for – whether it's for, you know, electrical fixtures – you know, you're always changing things." Tr. at 118, lines 15-19.

For example, according to the final waiver of lien, Cohn received $42,000 for carpentry labor done by independent contractors. Tr. at 70-71; **Pl. Ex. 10**. When asked at trial whether he had evidence that the laborers had been paid $42,000, Cohn demurred. "I could assure you the

house was not built, you know, for – you know, free. I had to pay somebody to build this house." Tr. at 71, lines 23-25. As another example, Cohn received $10,000 in late 2004 as reimbursement for the construction permit. One of his investors had fronted the money and Cohn repaid him. Tr. at 94-95. When asked if he knew how much the total cost of the permit was, Cohn replied: "If I requested $10,000, it was $10,000." Tr. at 95, line 6. Yet Cohn received another $5,000 on December 28, 2004, for the permit. Tr. at 99. Someone named Gerald Lakin wrote a check to the Village of Northfield for $13,596. **Pl. Ex. 11**. When asked whether "all $15,000 that you withdrew, paid to you by the title company went to Lakin?", Cohn could not recall. Tr. at 99-100. As a final example, it was unclear exactly how much Cohn paid for insurance premiums, whether it was $1,250 or $1,750. Tr. at 100-101. On December 28, 2004, however, Cohn received $10,000 as reimbursement for insurance. Tr. at 101; **Pl. Ex. 10**.

No documentary evidence was introduced to support Cohn's testimony that each of these payments were for goods or services furnished by a third party, and Cohn never gave his attorney any supporting documents. Tr. at 74. Cohn kept no records regarding these transactions

> because the title company had all the records. The title company had every documentation. If I ever needed anything, that's what a title company is for, to track – you know, keep track of where money was being disbursed for.

Tr. at 115, line 23 – p. 116, line 2.

According to the sworn statement Cohn submitted dated December 15, 2005, the total cost of building the house, including the price of the land, was $1,180,138.74. Tr. at 117. Since the cost of the land was $285,000, the total cost of construction was $895,138. Tr. at 138.

<u>The Brookhill Property is Finally Sold, But Not at a Profit</u>

The original listing price for the Brookhill Property was $1.7 million, with Korrub as the listing broker. Tr. at 154. During the two years that Korrub had the listing, there were showings

but no offers on the home. Tr. at 122.[1] Korrub denied that she ever believed she could get $1.7 million for the house. "We started high, hoping we could ride the market." Tr. at 154, line 25 – p. 155, line 1. She eventually lowered the price to $1.5 million. Tr. at 159. Approximately two months before the Brookhill Property sold, Jody Dickstein took over as listing broker and listed the house at $1,250,000. Tr. at 123.

On or about December 1, 2006, the Brookhill Property sold for $1.125 million. **Pl. Ex. 13**. Of this amount, Korrub received $64,000. Tr. at 155. Concept Design received nothing at closing. "I did not receive one penny from this house." Tr. at 124, lines 2-3.

$979,969.50 of the sale proceeds went to American Chartered Bank for the construction loan. **Pl. Ex. 13**. The amount that went to American Chartered Bank is approximately $85,000 more than the total cost of construction, which Cohn had testified was $895,138. Tr. at 139. While Cohn was building the Brookhill Property, he had three other new home construction projects proceeding simultaneously. Tr. at 68. He denied that any of the funds Concept Design received from building the Brookhill Property were used for expenses at the other projects. Tr. at 130.

Cohn was adamant that he had not attended the closing. Tr. at 144. Korrub was equally sure that he did. "Mr. Cohn was definitely at the closing. It was a very snowy December 1st morning, and he was there. He even gave me a check that morning, which he stopped payment on." Tr. at 153, lines 12-15.

---

[1] Korrub testified that "[y]ou can't have people walk through a house under construction and expect to sell it at a million five. So it wasn't really active." Tr. at 158, lines 1-3. A few moments later, she admitted that spec homes are sometimes sold during construction, and that she did have a buyer who wanted to purchase the home. The offer fell through when the buyer learned that the house would not be completed by his target date. Tr. at 158.

## Korrub Sues Cohn in State Court

Near the end of the project, Korrub asked Cohn for an accounting. Tr. at 62. Just before

closing, Korrub and Cohn signed an agreement in which Cohn promised to submit evidence to

properly account for each and every expense regarding the project. **Pl. Ex. 12**. When asked at

trial whether he ever gave Korrub an accounting subsequent to signing this agreement, Cohn

hemmed and hawed through two pages of testimony until finally admitting: "Oh, I can't recall."

Tr. at 63-65. Korrub had no doubt that she never received an accounting from Cohn. Tr. at 155.

Korrub eventually filed a state court lawsuit seeking an accounting and other relief. **Pl.**

**Ex. 1 at Ex. B**. On March 11, 2009, a default judgment was entered in the Circuit Court of Cook

County in favor of Korrub and against Cohn in the amount of $250,000. Tr. at 66; Complaint

and Answer, ¶ 15.[2] Later that year Korrub served a citation to discover assets on Cohn. **Pl. Ex.**

**1 at Ex. C**.

Concept Design stopped operating in January 2008, Tr. at 37, and Cohn caused it to file

for relief under Chapter 7 on March 6, 2009, **Pl. Ex. 4**.

## Cohn Files for Relief under the Bankruptcy Code and Makes Numerous Statements on his Schedules and Statement of Financial Affairs

Cohn filed his personal bankruptcy case on October 14, 2009. On the petition, Cohn

listed his address as 1946 Walnut Circle in Northbrook, Illinois. At trial, Cohn testified that

when he filed for relief under the Bankruptcy Code, he was living at 1138 Williamsburg Drive in

Northbrook, Illinois. Tr. at 8. According to his Statement of Financial Affairs, however, Cohn

transferred the Williamsburg Drive house to his soon-to-be ex-wife in May 2008. **Pl. Ex. 3**.

When reminded about this transfer at trial, Cohn revised his answer and stated that he "was

residing in Northbrook on, actually, I believe, Walnut Circle. I want to say 135 Walnut Circle."

---

[2] A copy of the default judgment is not part of the record.

Tr. at 10, lines 12-14.  Later in his testimony Cohn noted that he moved several times as he was getting divorced.  "I lived at 1138 Williamsburg, then I moved to Walnut Circle, then I moved to 135 Birchwood."  Tr. at 107, lines 20-21.

Cohn could not recall whether the divorce action had been filed at the time he filed for relief under the Bankruptcy Code:  "Again, I cannot – I can't recall.  I don't want to say yes, and I don't want to say no.  I'm not 100 percent, you know, sure."  Tr. at 133, lines 8-10.

He also testified that he was separated and going through a divorce at the time his ex-wife sold the Williamsburg Drive house.  Tr. at 110.  The sale occurred about ten weeks before he filed his bankruptcy petition.  **Pl. Ex. 6**.  The divorce was not listed on his Statement of Financial Affairs in answer to Question 4, which asks debtors to list all suits to which the debtor was a party within the past year.  Tr. at 135; **Pl. Ex. 3**.

Cohn did not list any dependents on Schedule I, even though he has three children who were all under the age of 18 at the time he filed his petition.  **Pl. Ex. 3**; Tr. at 14.  At trial, Cohn blamed his attorney for this omission:  "[H]e never said, oh, you have to list your children.  I mean, I would have – my children are my children."  Tr. at 109, lines 11-13.

Cohn testified both at trial and at his 2004 examination that he was unemployed during all of 2008.  Tr. at 15.  On his Statement of Financial Affairs, however, he estimated that his income during 2008 was $25,000.  **Pl. Ex. 3**.  At trial, Cohn could not remember "if that's incorrect or not incorrect."  Tr. at 16, lines 24-25.  He later testified that "when I say 'unemployed,' I did odd jobs.  But 25,000 could have been gifts that I received."  Tr. at 109, lines 19-21.

Cohn received $25,500.69 as his share of proceeds from the closing on the Williamsburg Drive house at the end of July 2009, and deposited his check at TCF Bank.  **Pl. Ex. 6; Pl. Ex. 7**.

Over the following month Cohn pulled out the sales proceeds, as well as several thousand dollars

that had been given or lent to him by his brother. Tr. at 23-25; **Pl. Ex. 7.**

On his Statement of Financial Affairs, Cohn was asked at Question 3(b) to list each

payment to any creditor made within ninety days of filing for relief under the Bankruptcy Code.

He listed RHT Design & Construction and SNB Remodeling and stated that each had been paid

on July 31, 2009. According to both the Statement of Financial Affairs and Cohn's trial

testimony, RHT received $14,000 and SNB received $6,000. **Pl. Ex. 3**; Tr. at 111, lines 20-21

("Between the both of them, altogether, about $20,000."). Cohn testified that he used the

proceeds from the sale of the house to pay these creditors, both of which had done work on the

Williamsburg Drive property in preparation for the sale. Tr. at 111-12.

At the time he filed his bankruptcy petition, Cohn owed approximately five or six

thousand dollars to Camp Merimeta. This creditor is not listed on Schedule F. Tr. at 29-31; **Pl.**

**Ex. 3**. When asked at his deposition why he did not list Camp Merimeta on Schedule F, Cohn

stated, "Because he's going to get paid. . . . My testimony is that one way or the other, whether

it's from me, my brother or someone, he will get paid money. . . . But if I never pay him, he'll

be fine with it." **Pl. Ex. 15**, p. 75, lines 5, 11-13, 23-24.

Cohn estimated that over the years his family gave him about fifteen or twenty thousand

dollars. When asked whether he owed money to those family members, Cohn replied, "that can

be debated. My family gave me money as gifts, so gifts do not necessarily get paid back." Tr. at

29, lines 21-23. When counsel pointed out that Cohn had testified in his deposition that the

funds advanced by his family were loans, Cohn stated that he had been unaware "of the

difference between loans and gifts." Tr. at 32, lines 10-11.

Cohn deposited $6,810 in his bank account during the period from August 26 to September 24, 2009. **Pl. Ex. 7**. The money probably came from his family – his brother, sister and father. **Pl. Ex 15** at 76-77; Tr. at 34.

Additionally, Cohn borrowed money from individuals outside his family, including Jeff Kroll. Tr. at 35. Neither Kroll nor any other individual (except Aliza Korrub) is listed in Schedule F. "Again, I did not list any personal people." Tr. at 35, lines 21-22.

Korrub Files a Motion to Compel Production of Documents in the Bankruptcy Case

Korrub noticed a motion to compel for June 15, 2010, seeking production of bank statements and documents related to work by RHT and SNB. After a hearing, this court ordered Cohn to produce certain requested documents and to appear for examination ("Order Compelling Production"). The documents included "all documents [illegible interlineation] in evidence of work performed by RHT Design & Construction and SNB Remodeling with regard to the real property commonly known as 1138 Williamsburg Drive, Northbrook, Illinois" as well as "all documents [illegible interlineation] in evidence of payment referenced in the statement of financial affairs to RHT Design & Construction and SNB Remodeling for work performed on" the Williamsburg Drive property. **Pl. Ex. 5**.

Cohn appeared for his 2004 examination on June 30, 2010. Afterwards, Korrub's counsel requested additional information, including a document from SNB that would disclose the work performed and the amount paid. Counsel also sought "all books and records in the possession of, or under the control of, the Debtor with regard to 21 Brookhill Drive, LLC." **Pl. Ex. 1 at Ex. F**. In response, Cohn produced one document from SNB dated July 30, 2009, showing services performed at a cost of $6,000 and no balance due. **Pl. Ex. 1 at Ex. G**.

Cohn neither produced books and records with regard to 21 Brookhill Drive, LLC, nor any other records relating to the work performed by SNB and RHT on his Williamsburg Drive residence.

## CONCLUSIONS OF LAW

Korrub seeks a finding that the debt Cohn owes to her is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).  She also seeks a finding that his discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(3), (a)(4)(A) and (a)(6)(A).  The court will address each cause of action as set forth in the complaint.

Standard for Dischargeability

Korrub bears the burden of proving by a preponderance of the evidence that her debt should be excepted from Cohn's discharge.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  The burden of going forward with evidence may shift occasionally, but the ultimate burden of persuasion remains with Korrub.  Sears, Roebuck & Co. v. Green, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003); FRE 301.  These principles are in accord with the primary purpose of the Bankruptcy Code, which "to grant a fresh start to the honest but unfortunate debtor."  Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367 (2007) (quotations omitted).

COUNT I -- 11 U.S.C. § 523(a)(2)(A)

Korrub seeks a finding that Cohn's debt to her is excepted from discharge pursuant to § 523(a)(2)(A):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

The burden is on Korrub to prove that actual fraud occurred. "[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" Husky Intern. Electronics, Inc. v. Ritz, ___ U.S. ___, 136 S. Ct. 1581, 1586 (2016).

Korrub alleges that actual fraud occurred when Cohn continued to increase the amount of the construction loan knowing that "there would never be enough money to split any profit, let alone to repay Plaintiff for the acquisition cost of the Property." Plaintiff's Post-Trial Brief at 9. The court finds this argument weak. Although Korrub testified that she never thought the house would sell for $1.7 million, that amount was in fact the initial asking price. With a $1.7 million price tag on the home, there was no reason for Cohn to think that a final cost of construction in the amount of $895,138 would not result in a profit for Korrub and himself, even after Korrub was repaid the $285,000 that she advanced to purchase the land. After all, Korrub was an experienced real estate agent and presumably brought to her arrangement with Cohn a superior knowledge of appropriate sale prices for new construction single family homes.

The Supreme Court acknowledged that while "'fraud' connotes deception or trickery generally, the term is difficult to define more precisely." Husky, 136 S. Ct. at 1586 (citation omitted).[3] Having heard the testimony of the parties and reviewed the submitted exhibits, the court is not convinced that Cohn defrauded Korrub. Although Cohn increased the amount of the construction loan by approximately 50% during the term of the project, Korrub did not prove by a preponderance of the evidence that he did so because he engaged in deception or trickery. She

---

[3] Well before the Husky decision, a Seventh Circuit panel provided a slightly more colorful description: "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." McClellan v. Cantrell, 217 F. 3rd 890, 893 (7th Cir. 2000) (quotation omitted).

may have felt pressured to sign the loan increases, but there was no evidence that the requests were driven by an intent to deceive her.

Instead, the court finds it far more likely that Cohn was so disorganized and incompetent that he put together an unrealistic budget at the outset of the project. This resulted in repeated requests for increases when he realized that each piece of the project would cost more than originally anticipated. This explanation addresses not just the need for the increases but the last minute nature of the requests that she signed off on.

Korrub argues, however, that Cohn's intent was wrongful, and that this can be inferred from his actions during the construction of the Brookhill Property: "(1) orchestrating a number of loan modifications to increase the amount of money being used to construct the Residence; (2) receiving numerous draws payable to Concept or the Defendant for materials and labor without providing lien waivers from the material suppliers and actual laborers; and (3) never providing to Plaintiff an accounting of the costs and expenses associated with the construction of the Residence." Plaintiff's Post-Trial Brief at 9.

These actions are just as likely to be due to incompetence and poor record-keeping as to fraudulent intent. The court is fully aware that it is difficult to prove wrongful intent from direct evidence, and that it is often inferred from the surrounding circumstances. See Deady v. Hanson, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) ("The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.") (citations omitted). But the circumstances of this case are so open to an alternate – and, having observed Cohn on the witness stand, plausible – explanation that the court cannot conclude that Korrub has proven by a preponderance of the evidence that Cohn acted wrongfully.

14

Cohn testified that he had built about a dozen houses as a general contractor. There was no evidence to suggest that his record-keeping on this project was better or worse than for any other project on which he worked. Neither did Korrub provide a basis for the court to conclude that Cohn was using funds designated for the Brookhill Property to fund other projects or his own personal expenses. While he signed many of the lien waivers rather than having his subcontractors sign them, there was no documentary evidence submitted or testimony heard to support a finding that the subcontractors had actually charged him a lower amount.

The court need not even reach the question of whether the lien waivers, if false, would have worked a fraud on Korrub. After all, it was American Chartered Bank that relied on the lien waivers to advance funds. Nor need the court consider whether the failure to provide an accounting was simply a contractual breach rather than potential evidence of fraud or wrongful intent, because after hearing the evidence, it is more likely that Cohn's failure was due to incompetence.

This complaint would have survived a motion to dismiss because it was reasonable to infer, based on Korrub's allegations, that Cohn acted wrongfully. But this decision follows a trial on the merits, and the court does not draw all reasonable inferences in Korrub's favor. The evidence submitted at trial does not show, by a preponderance of the evidence, that Cohn actually defrauded Korrub.

For the reasons stated above, the court will enter judgment for Cohn on Count I.

COUNT II - 11 U.S.C. § 523(a)(4)

Korrub seeks a finding that Cohn's debt to her is excepted from discharge pursuant to § 523(a)(4):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

There are no allegations that Cohn embezzled from Korrub, or that he committed larceny. Therefore, the issue before the court is whether he incurred a debt to Korrub for fraud or defalcation while acting in a fiduciary capacity.

To establish that a debt is nondischargeable pursuant to § 523(a)(4), a creditor must prove that (1) the debtor acted as a fiduciary to the creditor at the time the debt was created; and (2) the debt was caused by fraud or defalcation. See In re Jahrling, 816 F. 3rd 921, 925 (7th Cir. 2016); In re Berman, 629 F. 3rd 761, 766 (7th Cir. 2011).

The first question is whether Cohn was acting in a fiduciary capacity to Korrub – in other words, whether an express trust or fiduciary relationship existed between them. See Joyce v. Wish, 472 B.R. 763, 783 (Bankr. N.D. Ill. 2012).

> Under Illinois law, an express trust exists where there is (1) intent to create a trust; (2) definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose; and (6) delivery of trust property to the trustee. If any of the necessary elements of a trust are not described with certainty, no trust is created. Express or technical trusts are formed by positive acts of both parties, typically manifested in writing by a deed, will, or other such agreement.

In re Boricich, 2011 WL 2600692, *4 (Bankr. N.D. Ill. June 29, 2011) (citations and quotations omitted), amended by 464 B.R. 335 (Bankr. N.D. Ill. 2011) (only on question of entry of a money judgment).

Although Korrub quoted this passage in her post-trial brief, she makes no further argument that an express trust existed. The court will therefore consider whether a fiduciary relationship existed between the parties.

Even where no express trust exists, a cause of action under § 523(a)(4) may be based on a fiduciary relationship. Boricich, 2011 WL 2600692, *5. While this is so, the Supreme Court

teaches that "the non-dischargeability exception's reference to fiduciary capacity was 'strict and

narrow.'" Berman, 629 F. 3rd at 767 (quoting Davis v. Aetna Acceptance Co., 293 U.S. 328, 333

(1934). "In this Circuit, part of that narrow interpretation is that general partners and parties to a

joint venture are not fiduciaries when they are equals." Rutkowski v. Adas, 488 B.R. 358, 372

(Bankr. N.D. Ill. 2013), rev'd in part on other grounds, 2013 WL 6865417 (N.D. Ill. Dec. 30,

2013).

> If we probe more deeply the distinction between the fiduciary relation that imposes real duties in advance of the breach and the fiduciary relation that does not we find that the first group of cases involve a difference in knowledge or power between fiduciary and principal which, as we put it in Maksym v. Loesch, supra, 937 F. 2nd at 1242, gives the former a position of ascendancy over the latter. The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary; both factors are present in the case of a lawyer-client relation and also the relation between director and shareholder or managing partner and limited partner. Or the principal may be a child, lacking not only knowledge but also the power to act upon it. These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

Matter of Marchiando, 13 F. 3rd 1111, 1116 (7th Cir.) (citations omitted), cert. denied, 512 U.S.

1205 (1994).

Were Korrub and Cohn involved in a relation at arm's length between equals? Korrub

argues that they were not, and that Cohn was a fiduciary.

> By virtue of Plaintiff's lack of sophistication in the construction business and Defendant having been in the business for several years and juggling 3 construction projects at the same time, the parties had an unequal relationship. There was a special confidence imposed on Defendant with regard to Plaintiff and he had a fiduciary duty to her in furtherance of the construction of the Residence on the Property.

Plaintiff's Post-Trial Brief at 12 (footnote omitted).

The court does not agree. Unlike the plaintiff in Rutkowski v. Adas, Aliza Korrub was

not a blue collar immigrant working at a manufacturing job with little to no experience in real

estate. Korrub was not friendly with Cohn prior to going into business with him, and had no past

history of admiring his success. They had no personal relationship before meeting at random at

her place of employment – a real estate office.

Instead, Korrub was an experienced realtor who stepped into the project when Cohn's

land investor fell through. As Korrub testified, "well, I'd buy the land, and we'll work together

on the project. And that's how that happened." There was no testimony that he lured her in to

the joint venture with promises of big profits; indeed, Korrub was the partner who priced the

home and worked as the listing broker until two months before the house was finally sold.

Did Korrub repeatedly ask for an accounting, requests that were ignored? She probably

did. The court found her credible on this point. But she also had a lawyer, who told her "we'll

have to deal with all this after closing." She had the opportunity to visit the construction site as

often as she wanted to, and she occasionally did so. There was no testimony that Cohn tried to

keep her away. And although she testified that she never reviewed the construction budget, it

was attached to the loan documents she signed and in fact she initialed it.

The court is mindful of the Seventh Circuit's instruction that the reference to fiduciary

capacity is construed strictly and narrowly. In most business relationships, as in this one, parties

bring different sets of skills to the table – that does not, in and of itself, create a fiduciary

relationship between those parties. While Korrub and Cohn had different types of expertise, the

testimony did not establish that the differences in their knowledge or power gave Cohn a position

of ascendancy over Korrub. No fiduciary relationship was established, and thus Cohn's debt to

Korrub is not excepted from discharge pursuant to § 523(a)(4).

For the reasons stated above, the court will enter judgment for Cohn on Count II.

COUNT III - 11 U.S.C. § 523(a)(6)

Korrub seeks a finding that Cohn's debt to her is excepted from discharge pursuant to §

523(a)(6):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
> does not discharge an individual debtor from any debt—
>
> > (6)     for willful and malicious injury by the debtor to another entity or to
> > the property of another entity.

The Supreme Court clarified the meaning of this subsection, stating that "only acts done

with the actual intent to cause injury" come within its scope. Kawaauhau v. Geiger, 523 U.S. 57,

61 (1998). Our Circuit later specified "that a willful and malicious injury, precluding discharge

in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had

no legal justification and either desiring to inflict the injury or knowing it was highly likely to

result from his act." Jendusa-Nicolai v. Larsen, 677 F. 3rd 320, 324 (7th Cir. 2012).

Therefore, in order to prevail on this count, Korrub must prove by a preponderance of the

evidence that Cohn inflicted injury on her knowing that he had no legal justification to do so, and

either desired to inflict that injury or knew it was highly likely to occur from his actions.

Korrub argues that Cohn "must have known that increasing the loan amount and

submitting the various lien waivers and receiving monies payable to Concept or the Defendant

was going to result in an injury to Plaintiff's interest in the Residence in that even receiving

repayment of her investment in the amount of $285,000, let alone any profit in excess of the cost

of the project, was in serious jeopardy." Plaintiff's Post-Trial Brief at 10.

The court is not convinced by this argument. Korrub set the price for the Brookhill

Property at $1.7 million. "We started high, hoping we could ride the market." She eventually

lowered the price to $1.5 million. Even when another realtor took over the listing, the offering

price of $1.25 million still came close to the total cost of building the house.

Although certainly Cohn would have known that any increase in the construction loan could cut into the partners' profit, he testified that the construction loan increases were due to upgrades. These should have potentially increased the profit on the Brookhill Property. Indeed, as the court stated in the discussion of § 523(a)(2), there was no reason for Cohn to think that a final cost of construction in the amount of $895,138 would not result in a profit for Korrub and himself. After all, Korrub had set the price and he trusted her to know what she was doing.

The evidence does not suggest that Cohn increased the amount of the construction loan with the intent to injure Korrub by reducing her potential profit, or even that he knew injury was highly likely to result. Moreover, every increase in cost that reduced Korrub's profit reduced <u>his</u> potential profit as well, since once Korrub had been repaid for the cost of the land, profits were to be split 60/40 between Concept Design and Korrub.

The wording of § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts'. . .". <u>Geiger</u>, 523 U.S. at 61. While the evidence showed that Cohn was inept and amateurish when it came to keeping track of records and funds, his lack of attention to financial details does not support a finding that he committed an intentional tort against Korrub. "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." <u>Id.</u> at 64. Korrub has not demonstrated by a preponderance of the evidence that Cohn inflicted injury on her knowing that he had no legal justification to do so, and either desired to inflict that injury or knew it was highly likely to occur from his actions.

For the reasons stated above, the court will enter judgment for Cohn on Count III.

Standard for Denial of Discharge

Objections to discharge are construed strictly against the objecting creditor and liberally

in favor of the debtor. See In re Kontrick, 295 F. 3rd 724, 736 (7th Cir. 2002), aff'd, Kontrick v.

Ryan, 540 U.S. 443 (2004). According to the Federal Rules of Bankruptcy Procedure, "[a]t the

trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the

objection." Fed. R. Bankr. P. 4005. In the Seventh Circuit, the objecting creditor must establish

grounds for denial of discharge by a preponderance of the evidence. In re Scott, 172 F.3rd 959,

966–67 (7th Cir.1999). Denial of discharge is a drastic remedy reserved only for the worst actors.

See, e.g., Stathopoulos v. Bostrom, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), aff'd, 2003 WL

403138 (N.D. Ill. Feb. 20, 2003).

COUNT IV - 11 U.S.C. § 727(a)(3)

Pursuant to § 727(a)(3),

(a) The court shall grant the debtor a discharge, unless - . . .

> (3)     the debtor has concealed, destroyed, mutilated, falsified, or failed
> to keep or preserve any recorded information, including books,
> documents, records, and papers, from which the debtor's financial
> condition or business transactions might be ascertained, unless such act or
> failure to act was justified under all the circumstances of the case.

A creditor need not prove that the debtor intended to defraud it by failing to keep or

destroying books and records; "[s]ection 727(a)(3) does not require proof of criminal or quasi-

criminal conduct." Scott, 172 F. 3rd at 969.

Korrub proved that Cohn failed to keep and preserve records that would have provided a

road map for understanding how the construction loan funds were spent at the Brookhill

Property. Under oath, Cohn claimed that he did not preserve records "because the title company

had all the records. The title company had every documentation. If I ever needed anything,

that's what a title company is for, to track – you know, keep track of where money was being disbursed for."

But proving that Cohn was a poor record-keeper on the Brookhill Property project is not enough for the court to order denial of discharge in Cohn's bankruptcy case. While the Seventh Circuit has instructed us that the language of § 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs," Scott, 172 F. 3rd at 969 (citation omitted), it gave that instruction in the context of a complicated Chapter 11.

> [M]ost bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3). But where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping. See Juzwiak, 89 F.3$^{d}$ at 428. As the debtors in this case lost over $20 million, there might be grounds to question their level of sophistication. But as they solicited the investments made, set up the impenetrable financial maze and directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor.

Id., 172 F. 3rd at 970.

Cohn's situation is more like the debtor in Cottini v. Blanchard, 516 B.R. 11 (Bankr. N.D.N.Y. 2014). Cottini hired Blanchard as the general contractor for construction of her single family home. The only records Blanchard retained were some of the invoices and receipts, as well as bank records and tax returns. Blanchard did not preserve most of the subcontractors' invoices and many had not even provided him with receipts – he simply paid them in cash. 516 B.R. at 14-15. Of the $200,000 Cottini advanced to Blanchard, he could document about $40,000 in expenses.

In rejecting Cottini's request to deny Blanchard's discharge, the trial court heeded the Second Circuit's directive that the purpose of § 727(a) is to "punish actions that hamper the Trustee's ability to collect and distribute non-exempt assets on behalf of creditors." Berger &

<u>Associates, et al. v. Kran</u>, 760 F. 3rd 206, 211 n.2 (2nd Cir. 2014). "[I]t does not exist to police

the debtor's legal and ethical obligations more generally." <u>Id.</u> at 211.

Therefore, "[e]ven if a debtor has an independent legal obligation to keep certain

documentation or records, the absence of such records, standing alone, is insufficient to invoke §

727(a)(3)." <u>Cottini</u>, 516 B.R. at 17 (citation omitted). Instead, "[t]he importance of the records

under § 727(a)(3) lies in their necessity to ascertain the Debtor's financial condition. In no case

shall the 'extreme penalty' of denying a discharge be invoked when the debtor's failings are

clearly unconnected with the bankruptcy proceeding." <u>Id.</u> (citation omitted).

Similarly, Korrub's argument in seeking denial of Cohn's discharge pursuant to §

727(a)(3) focuses on the lack of supporting records for the Brookhill Property. The LLC that

Korrub and Cohn formed at the start of the project was organized in February 2004. They took

out the construction loan a couple of months later, and completed the home in mid-2006. The

Brookhill Property sold on December 1, 2006, <u>nearly three years</u> before Cohn filed for relief

under the Bankruptcy Code. As in <u>Cottini</u>, "there is no bankruptcy purpose in understanding the

relationship between the Debtor and his subcontractors on a construction project which ended . . .

[well] before the Debtor sought bankruptcy relief." <u>Cottini</u>, 516 B.R. at 18.

This is not a case in which the Chapter 7 trustee was unable to administer the estate

because of a lack of financial information. Although Cohn's Chapter 7 trustee brought a motion

to dismiss the bankruptcy case, the motion was based on Cohn's failure to appear at his meeting

of creditors. An agreed order was eventually entered, requiring Cohn to provide a copy of his

last federal income tax return, appear at the next scheduled meeting of creditors, and pay $250 to

the trustee for his costs. The motion to dismiss was continued, but withdrawn by the trustee

before the next hearing. A week later, the trustee entered a no asset report.

Rather than being a case in which the trustee and creditors cannot "ascertain the debtor's financial condition and track his financial dealings," In re Juzwiak, 89 F. 3rd 424, 427 (7th Cir. 1996) (quotation omitted) the instant situation is basically a two party dispute. Essentially, Korrub is seeking an accounting so she can find out where the funds designated for her particular project were spent. But the purpose of invoking the harsh remedy of denial of discharge is to ensure that "debtors without proper books and records . . . [cannot] frustrat[e] a trustee's ability to liquidate prepetition assets to satisfy prepetition debts." Scott, 172 F. 3rd at 969. That is not an issue here.

For all of the reasons stated above, the court will enter judgment for Cohn on Count IV.

COUNT V - 11 U.S.C. § 727(a)(4)(A)

Pursuant to § 727(a)(4)(A),

(a)      The court shall grant the debtor a discharge, unless – . . .

> (4)      the debtor knowingly and fraudulently, in or in connection with the case –
>
> > (A) made a false oath or account.

In order "to prevail on a claim under this subsection, the [plaintiff] must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." Stamat v. Neary, 635 F. 3rd 974, 978 (7th Cir. 2011) (string citations omitted).

Cohn Made Five Statements Under Oath That Are At Issue

"A debtor's petition, schedules, statement of financial affairs, statements made at an 11 U.S.C. § 341 meeting, and answers to interrogatories all constitute statements under oath for

purposes of § 727(a)(4). <u>Fiala v. Lindemann</u>, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007)

(citations omitted). The following statements or omissions under oath are at issue in this case:

- Cohn's address on the petition;

- Cohn's failure to list any dependents on Schedule I;

- Cohn's omission of family members and "personal people" from Schedule F;

- Cohn's omission of Camp Marimeta from Schedule F; and

- Cohn's failure to disclose his divorce in answer to Question 4 on his Statement of
  Financial Affairs.

<u>Four of the Five Statements Were False</u>

- On his petition, Cohn listed his residence as 1946 Walnut Circle in Northbrook,
  Illinois. There is no evidence suggesting that this address is incorrect; Cohn testified
  that he lived at 1138 Williamsburg Drive until around the time it was sold in July
  2009. He then moved to Walnut Circle. Therefore, the court finds that this statement
  is not false.

- Cohn did not list any dependents on Schedule I, even though he had three children
  under the age of 18.

- Cohn estimated that over the years his family gave him about fifteen or twenty
  thousand dollars. When asked whether he owed money to those family members,
  Cohn replied, "that can be debated. My family gave me money as gifts, so gifts do
  not necessarily get paid back." The court is not convinced that the advances were
  gifts; Cohn's credibility on this point was questionable. When plaintiff's counsel
  pointed out that Cohn had testified in his deposition that the funds advanced by his
  family were loans, Cohn stated that he had been unaware "of the difference between

loans and gifts." Such disingenuousness does Cohn no favors. He also admitted that

at least one non-family member loaned him money and was not listed on Schedule F.

Omitting these parties from Schedule F constitutes making a false statement.

- Cohn owed approximately five or six thousand dollars to Camp Merimeta but did not
  list it on Schedule F.

- Question 4 on the Statement of Financial Affairs asks debtors to "[l]ist all suits and
  administrative proceedings to which the debtor is or was a party within one year
  immediately preceding the filing of this bankruptcy case." Cohn testified that he was
  going through a divorce at the time his ex-wife sold the Williamsburg Drive house,
  which was about ten weeks before he filed his bankruptcy petition. Failing to list the
  divorce in answer to Question 4 was a false statement.

Cohn Knew that the Four False Statements were Omissions or Misstatements

- Cohn blamed his attorney for the failure to list his children as dependents: "[H]e
  never said, oh, you have to list your children. I mean, I would have – my children are
  my children." Cohn knew that listing "none" in answer to a question about his
  dependents was an omission.

- Cohn knew that he omitted family members and individual lenders from his
  schedules. His testimony that he "did not list any personal people" leads the court to
  the conclusion that he deliberately excluded these creditors from Schedule F. This
  choice was not his to make; general unsecured creditors are listed on Schedule F
  whether they are friends or third party lenders.

- Cohn knew that he owed money to Camp Merimeta and chose not to list it on
  Schedule F. Perhaps he thought that having a personal relationship with the camp

26

made a difference as to whether it should be listed, but it does not. As stated above,

all general unsecured creditors are listed on Schedule F, even if their relationship with

the debtor is not arms-length.

- ■ Although Cohn testified <u>at trial</u> that he could not remember whether he was going

  through a divorce at the time he filed his bankruptcy petition, the court is hard-

  pressed to believe that he would not have known the divorce was ongoing <u>when he</u>

  <u>signed his petition.</u>

<u>All of the False Statements That Cohn Knew Were Omissions or Misstatements Related
Materially to the Bankruptcy Case</u>

Facts are material if they bear

a relationship to the debtor's business transactions or estate, or concern[] the
discovery of assets, business dealings, or the existence and disposition of the
debtor's property. In determining whether or not an omission is material, the
issue is not merely the value of the omitted assets or whether the omission was
detrimental to creditors. . . . [T]he successful functioning of the Bankruptcy Code
hinges both upon the bankrupt's veracity and his willingness to make a full
disclosure.

<u>Stamat</u>, 635 F. 3rd at 982-83 (citations and quotations omitted).

Cohn's omissions and misstatements related materially to his bankruptcy case.

<u>A Presumption Arose that Cohn Made These False Statements and Omissions with Fraudulent
Intent, and Cohn Failed to Rebut This Presumption</u>

"Intent to defraud involves a material misrepresentation that you know to be false, or,

what amounts to the same thing, an omission that you know will create an erroneous

impression." <u>In re Chavin</u>, 150 F. 3rd 726, 728 (7th Cir. 1998) (citations omitted). A reckless

disregard for the truth is sufficient to prove fraudulent intent. <u>Stamat</u>, 635 F. 3rd at 982.

In many cases, direct evidence of fraudulent intent is unavailable. Therefore, fraudulent

intent may be inferred from circumstantial evidence. In the Seventh Circuit, the factors known as

"badges of fraud" from which fraudulent intent may be inferred include:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Village of San Jose v. McWilliams, 284 F. 3rd 785, 791 (7th Cir. 2002) (quotation omitted). If even one of these factors is satisfied, a presumption of fraudulent intent arises. The burden is then shifted to the debtor to rebut that presumption. Id.

As the court noted at the conclusion of trial, Cohn's failure to list his dependents, which he blames on his attorney, is a glaring omission.

> THE COURT:      [O]n that point, whether I decide it's material or not . . . I'm a bit of a stickler when somebody signs something under oath. Our whole system depends on that.
>
> Now, if the lawyer asked him the question – Mr. Burns [Cohn's attorney in the bankruptcy case] asked him the questions, and he didn't ask that one, you know, he [Cohn] still sits down; he still has the papers in front of him; and he signs them under oath, with penalty of perjury.
>
> And this is not like some esoterical, legal issue. I mean, you either have dependents or you don't.

Tr. at 170, line 22 – p. 171, line 8.

This omission is compounded by Cohn's failure to list any debts owed to family members and other individual lenders. Over the years, relatives had transferred between fifteen and twenty thousand dollars to Cohn, a not insignificant sum. Yet none of his family members are listed on Schedule F.

While debtors must disclose all creditors, it is perhaps even more important for debtors to list those creditors who are friends and family. These are often the parties most likely to be the recipient of avoidable transfers, whether fraudulent or preferential, and so a debtor's failure to list these creditors may frustrate a trustee's investigation. See In re Urbonas, 539 B.R. 533, 549

(Bankr. N.D. Ill. 2015) ("To protect the family members that had received cash gifts from the

Chapter 7 trustee, the Debtors failed to disclose all of the transfers in their initial schedules.").

Indeed, one of the badges of fraud from which courts may infer fraudulent intent is "the family,

friendship or close associate relationship between the parties." Village of San Jose, 284 F. 3rd at

791.

Cohn's failure to list those friends and family members who were also creditors is further

support for the key badge of fraud in this case -- "the existence or cumulative effect of the

pattern ... or course of conduct." There is a pattern of a cavalier treatment of the facts. "[T]he

cumulative effect of false statements may, when taken together, evidence a reckless disregard for

the truth sufficient to support a finding of fraudulent intent." In re Duncan, 562 F. 3rd 688, 695

(5th Cir. 2009) (citation omitted), cited with approval by Stamat, 635 F. 3rd at 982 ("Here, the

totality of the Stamats' omissions and errors rises above mere negligence to the level of reckless

disregard for the truth.").

Although he may not have intended to deceive his creditors when he omitted his relatives

and other individual lenders from Schedule F, it is the pattern of Cohn's omissions and

misstatements that is so troubling. Cohn omitted the friends and relatives who had lent him

money, he did not list the multi-thousand dollar debt owed to Camp Marimeta, he did not

disclose his dependents on Schedule I and he did not list his divorce in the Statement of

Financial Affairs. "The manner in which these schedules were completed . . . does not indicate a

debtor who took to heart the responsibility of providing accurate information." Beermann

Swerdlove LLP v. Korner, 2013 WL 1700935, *13 (Bankr. N.D. Ill. April 18, 2013).

Cohn's testimony on his failure to list friends and relatives was far from credible.

Although he ran a construction business for about ten years, Cohn testified that he was unaware

"of the difference between loans and gifts." As the court noted earlier, Cohn's disingenuousness is hard to swallow and undermines his credibility.

At trial, Cohn demonstrated a pattern of remembering when it was convenient for him, and of forgetting when it was not. When asked at trial whether his divorce was pending when he filed his bankruptcy petition, Cohn equivocated: "I can't recall. I don't want to say yes, and I don't want to say no. I'm not 100 percent, you know, sure." In another example, Korrub's counsel asked Cohn at trial whether he ever gave Korrub an accounting from the Brookhill project. He avoided answering and danced around the question through two pages of testimony before finally declaring, "Oh, I can't recall." Similarly, Cohn was adamant that he had not attended the closing on 21 Brookhill. Korrub was equally sure that he had, and her testimony was far more convincing: "It was a very snowy December 1st morning, and he was there. He even gave me a check that morning, which he stopped payment on." Cohn's trial testimony is not the basis for denying his discharge, but it is further support for a finding that Cohn's attitude toward telling the truth was less than desirable.

Taken together, Cohn's omissions and misstatements "evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." Duncan, 562 F. 3rd at 695.

For all of the reasons stated above, the court will enter judgment for Korrub on Count V.

COUNT VI - 11 U.S.C. § 727(a)(6)(A)

Pursuant to § 727(a)(6)(A),

(a) The court shall grant the debtor a discharge, unless . . .

    (6)    the debtor has refused, in the case –

        (A)    to obey any lawful order of the court, other than an order to respond to a material question or to testify.

The Order Compelling Production required Cohn to produce documents relating to work performed by and payment made to RHT Design & Construction and SNB Remodeling with regard to the Williamsburg Drive house. Cohn produced only one $6,000 invoice and no other records relating to the work performed by SNB and RHT. Korrub argues that Cohn failed to comply with the Order Compelling Production, and that his discharge should therefore be denied.

Objections to discharge are construed strictly against the complaining creditor. The evidence does not support a finding that Korrub proved, by a preponderance of the evidence, that Cohn <u>refused to obey</u> the Order Compelling Production. Although producing one $6,000 invoice to support $20,000 in services rendered could be suspect, the court is not surprised that this was the only document Cohn produced. It has already been established that Cohn was far from a model record-keeper. At trial, Cohn described the work performed to get the Williamsburg Drive house ready for sale, and while there should have been more supporting documentation, it is more likely that Cohn did not preserve it, as opposed to refusing to turn it over to Korrub. Cohn's sloppiness cut against him in the discussion above regarding § 727(a)(4). The court will not punish him again for failing to produce documents that it is most likely he lost immediately, if he ever had them at all.

For all of the reasons stated above, the court will enter judgment for Cohn on Count VI.

## COSTS AND ATTORNEY'S FEES

Korrub requested an award of attorney's fees and costs. The court will first address the question of costs.

Pursuant to Fed. R. Bankr. P. 7054(b)(1), "[t]he court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides." In the

context of the analogous Federal Rule of Civil Procedure, the Seventh Circuit "has held that

under Rule 54(d) the 'prevailing party' is the party who prevails 'as to the substantial part of the

litigation.'" First Commodity Traders, Inc., v. Heinold Commodities, Inc., et al., 766 F. 2nd

1007, 1015 (7th Cir. 1985) (quotation omitted).  Under this test – and Korrub has suggested no

other – she is not the prevailing party and therefore is not entitled to costs.

As for an award of attorney's fees, Fed. R. Bankr. P. 7054(b)(2) provides that Fed. R.

Civ. P. 54(d)(2)(A)-(C) and (E) applies in adversary proceedings:

(2) Attorney's Fees.

(A) Claim to Be by Motion. A claim for attorney's fees and related
nontaxable expenses must be made by motion unless the substantive law requires
those fees to be proved at trial as an element of damages.

(B) Timing and Contents of the Motion. Unless a statute or a court order
provides otherwise, the motion must:

(i) be filed no later than 14 days after the entry of judgment;

(ii) specify the judgment and the statute, rule, or other grounds
entitling the movant to the award;

(iii) state the amount sought or provide a fair estimate of it; and

(iv) disclose, if the court so orders, the terms of any agreement
about fees for the services for which the claim is made.

(C) Proceedings. Subject to Rule 23(h), the court must, on a party's
request, give an opportunity for adversary submissions on the motion in
accordance with Rule 43(c) or 78. The court may decide issues of liability for fees
before receiving submissions on the value of services. The court must find the
facts and state its conclusions of law as provided in Rule 52(a). . . .

(E) Exceptions. Subparagraphs (A)-(D) do not apply to claims for fees and
expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. §
1927.

The first requirement is that the claim for attorney's fees and related expenses be made

by motion, not by request in a complaint or post-trial brief.  Nevertheless, because the court

would deny any such motion, the issue will be addressed herein.

Any motion that Korrub would file would have to specify the judgment and the statute, rule, or other grounds entitling her to an award of attorney's fees. Although she devoted a page of her brief to her request for attorney's fees, she mentions no judgment, statute or rule that would support an award. Instead, she focuses on the argument that attorney's fees incurred in prosecuting a nondischargeable claim are themselves nondischargeable. See Klingman v. Levinson, 831 F. 2nd 1292 (7th Cir. 1987); In re Mayer, 173 B.R. 373 (N.D. Ill. 1994), aff'd, 51 F. 3rd 670 (7th Cir.), cert. denied, 516 U.S. 1008 (1995); In re Lymberopoulos, 453 B.R. 340 (Bankr. N.D. Ill. 2011).

The court has no quarrel with that argument or with the cases Korrub cites. But the cases do not support Korrub's request. She seeks an award of attorney's fees simply because she successfully sought a denial of Cohn's discharge. That success is not a basis for awarding attorney's fees. The grounds for finding attorney's fees nondischargeable depends on the whether the debt deemed nondischargeable provided for such an award.[4]

For example, the Klingman panel found a judgment-debt nondischargeable. Therefore "the award of attorney's fees, to which Mr. Levinson stipulated in the consent judgment, is also nondischargeable." 831 F. 2nd at 1297 (footnote omitted). What Korrub has missed is that she is asking not just for a finding that attorney's fees are nondischargeable, but that this court award attorney's fees in the first place.

None of the cases Korrub cites stand for the proposition that a court may award fees incurred by the plaintiff in the adversary proceeding to determine dischargeability if the underlying debt is not "evidenced by a note or other contract allowing attorneys' fees". Id. at

---

[4] In fact, since Korrub lost on her nondischargeability counts, there is no underlying debt that was deemed nondischargeable. Even if she had prevailed on any of the § 523 counts, however, she would not be entitled to an award of attorney's fees because there is no evidence that the default judgment she obtained in state court included attorney's fees.

33

1296 (quotation omitted).  See Richeson v. Saltzman, 1997 WL 539660, *12 (N.D. Ill. Aug. 22,

1997) ("[T]here is no statutory provision entitling a successful creditor to reimbursement for

attorney fees incurred in proving a § 523 exception.") (citations omitted), aff'd, 142 F. 3rd 440

(7th Cir. 1998).

In fact, the only instance in which fees are awarded following disposition of a

nondischargeability complaint is:

> If a creditor requests a determination of dischargeability of a consumer debt under
> subsection (a)(2) of this section, and such debt is discharged, the court shall grant
> judgment in favor of the debtor for the costs of, and a reasonable attorney's fee
> for, the proceeding if the court finds that the position of the creditor was not
> substantially justified, except that the court shall not award such costs and fees if
> special circumstances would make the award unjust.

11 U.S.C. § 523(d) (emphasis added).  See Trustees of the Will County Carpenters, Local 174,

Health and Welfare Fund v. Cooney, 532 B.R. 296 (N.D. Ill. 2015).

Although Cohn prevailed on Count I, in which Korrub requested a determination of

dischargeability under § 523(a)(2), he cannot request an award of fees under § 523(d) because it

applies only to requests for determination of dischargeability of consumer debts.  The

Bankruptcy Code defines "consumer debt" as "debt incurred by an individual primarily for a

personal, family, or household purpose."  11 U.S.C. § 101(8).  See Cooney, 532 B.R. at 300.

The parties may not have agreed on much, but they agreed that they entered this transaction with

the goal of making a profit.  Any debt Cohn incurred to Korrub was a business debt, not a

consumer one, and Cohn would have no basis for requesting fees under § 523(d).

For the reasons stated above, any request by Korrub for attorney's fees and/or for costs

made by motion following entry of judgment will be denied.

34

## CONCLUSION

Plaintiff Aliza Korrub brought this complaint against Defendant Edward Cohn, seeking a finding that the debt Cohn owes to Korrub is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), and that Cohn's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3), (a)(4)(A) and (a)(6)(A).  Korrub also requested an award of attorney's fees and costs.

For all of the reasons stated above, the court will enter judgment for Cohn on all counts except Count V.  Judgment will be entered for Korrub on Count V and Cohn's discharge will be denied.

Date:  NOV 15 2016

PAMELA S. HOLLIS
United States Bankruptcy Judge